1

2

3

4

5                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
6

7   JOHN L. SWIGER,                 )  No. CV-05-398-CI
                                    )
8            Petitioner,            )  REPORT AND RECOMMENDATION
                                    )  TO DISMISS WITH PREJUDICE
9   v.                              )  CLAIMS FOR HABEAS RELIEF
                                    )
10  HAROLD CLARKE, Secretary,       )
    Washington State Dept. of       )
11  Corrections,                    )
                                    )
12           Respondent.

13       BEFORE THE COURT on Report and Recommendation is Respondent's

14  Answer and Memorandum of Authorities, which the court construes as

15  a Motion to Dismiss under Rule 8, Rules Governing § 2254 Cases. (Ct.

16  Rec. 10.)  Petitioner, represented by attorney Jeffry K. Finer, is

17  on release pending resentencing following reversal of the trial

18  court's Order crediting him good time.  Assistant Attorney General

19  John J. Samson represents Respondent.   The parties have not

20  consented to proceed before a magistrate judge.

21       On May 17, 2002, Petitioner was found guilty by jury verdict of

22  first-degree assault following retrial and was sentenced to 93

23  months.  (Ct. Rec. 7, Ex. 1.)  Before the second trial, the parties

24  agreed and the court ordered the new jury should not be told about

25  the earlier trial or prior verdict.  The identity of the alleged

26  victim's assailant was the principal issue at trial.

27  Notwithstanding the court's Order, during cross-examination of co-

28

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 1

defendant and witness Jack Hatfield, Mr. Hatfield referred to Petitioner's first trial and conviction.   At the end of Mr. Hatfield's testimony, defense counsel conferred with their client, chose not to move for a mistrial, but requested a curative instruction.   The jury was instructed to disregard Mr. Hatfield's statement.[1]   Petitioner also alleges during jury deliberations, THE SPOKESMAN-REVIEW published an article referencing Petitioner's first trial and conviction.   Petitioner contends there were allegations at least one juror was aware of the article.

       After the jury convicted him, Petitioner moved for a new trial, contending Mr. Hatfield's statement and the newspaper article tainted the jury's deliberations.   The trial court interviewed the

_____

       [1]Petitioner also alleges a second witness, Noel Ramey, testified Petitioner struck the driver, not the passenger, a change in testimony from the first trial when Mr. Ramey testified Petitioner struck the passenger.   Petitioner asserts there was no attempt made to impeach Mr. Ramey's testimony.   This factual claim was raised in the Personal Restraint Petition (Ct. Rec. 7, Ex. 9 at 3), but no legal analysis was presented to the Court of Appeals demonstrating a violation of federal constitutional rights and the Court of Appeals did not address the claim in its opinion. Similarly in the Petition at bar, Petitioner has not provided legal analysis to support his contention the failure to impeach Mr. Ramey's in-court testimony was violative of a specific provision of the federal constitution.   Thus, **IT IS RECOMMENDED** the claim be **DISMISSED WITH PREJUDICE** as unexhausted and procedurally defaulted. 28 U.S.C. § 2254(b)(2).

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 2

jurors individually in February 2002, permitted examination of those jurors by counsel, and issued findings that no taint had occurred. The Court of Appeals, based on the trial court's findings, concluded on direct appeal there was no error; the Supreme Court denied discretionary review. (Ct. Rec. 7, Ex. 7.)  On collateral review, the Court of Appeals ruled Petitioner failed to demonstrate the jurors were exposed to extra-judicial information much less that they had considered such information during deliberations.  (Ct. Rec. 7, Ex. 11 at 4.)  Discretionary review was denied.  (Ct. Rec. 7, Ex. 13.)  This Petition followed.

## ISSUES

Petitioner seeks federal habeas relief, raising two claims: First, in light of the jury's exposure to information regarding the first trial and conviction, whether Petitioner was required to show prejudice under federal law to obtain a new trial; if not required, did the State show the absence of prejudice and if it did, was the evidence of guilt such that the jury's exposure to the extra-judicial information caused "substantial and injurious effect or influence in determining the jury's verdict" under *Brecht v. Abrahamson*.  Second, on retrial, were trial and appellate counsels' performances ineffective when both failed to notice or redact a portion of a defense exhibit sent to the jury room that referenced the first, reversed trial.

Respondent moves for dismissal with prejudice of both claims on the merits.  Respondent acknowledges exhaustion of the first claim to the extent it alleged the jury was improperly exposed to Mr. Hatfield's statement during trial and the newspaper article, as well

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 3

1    as the second claim involving ineffective assistance of counsel.

2    Respondent argues to the extent the first claim alleges the jury was

3    improperly exposed to information on defense Exhibit 28, the claim

4    was procedurally barred under the invited error doctrine.

5                                   **FACTS**

6       The state court summarized the facts surrounding Petitioner's

7    convictions as follows:

8          Mr. Swiger was charged with assaulting Jeffrey Feagan
         on October 14, 1995.  A jury found him guilty, but the

9          superior court ordered a new trial.  Before the new trial,
         the parties agreed that the new jury should not be told

10         about the earlier trial or the prior jury's verdict.
         During cross examination, however, Jake Hatfield, who had

11        accepted a plea agreement for his involvement in the
         crime, testified:

12                                                              Q:    And you chose not to go to trial. Right?

13          A:    Yeah.  You bet I did.
         Q:    Because you thought you could have been

14                found guilty?
         A:    Yeah, right, because -[Mr. Swiger] didn't

15                do it, so look what I am looking at.  He
               got found guilty.

16

17          After completing the cross-examination, defense
         counsel asked for a recess to discuss with Mr. Swiger "the

18        possibility of asking for a mistrial."  After a recess,
         defense counsel told the court he and Mr. Swiger had

19        decided not to move for a mistrial, but he requested that
         the jury be instructed to disregard Mr. Hatfield's

20        statement.  The court complied by instructing the jury:

21          Ladies and gentlemen of the jury, the
         unsolicited statement by this witness regarding

22          a prior outcome to the defendant is stricken.
         And the jury is instructed to disregard the

23          statement in its entirety.  And not to consider
         it, in any manner.

24          Later, as the jury began its deliberations, a Spokane
         newspaper published an article under the headline: "Jury

25        deliberates 1995 assault case."  A subheadline stated:
         "Prosecutors are still convinced John L. Swiger guilty of

26        beating."  The lead paragraph of the article stated: "When
         John L. Swiger was convicted in 1996 of assault, it was at

27        least partly on the strength of testimony from Eric J.
         Hood."  The article contained several other references to

28

Mr. Swiger's first trial.

After the second guilty verdict, Mr. Swiger moved for another new trial, arguing in part that the newspaper article and Mr. Hatfield's statement during trial tainted the jury's deliberations. The court interviewed the jurors individually and allowed both the prosecutor and defense counsel to question them about the two events and their effect on deliberations.

(Ct. Rec. 7, Ex. 2, Unpublished Opinion, *State v. Swiger*, Court of Appeals Cause No. 21223-8-III, at 2-4 (references to Report of Proceedings and Clerks Papers omitted).)

## PROCEDURAL DEFAULT

Respondent moves to dismiss with prejudice the first habeas claim to the extent it relies on the jury's review of defense Exhibit 28 admitted during trial. The exhibit referenced Petitioner's restitution obligation imposed following the first conviction. Respondent argues the claim involves invited error as the admission of the Exhibit was offered by the defense over the state's objection and admitted by the court. The reference to Petitioner's restitution obligation was noted first by Juror Boyles during his post-trial examination by the court:

MR. HUEBER [defense counsel]:  How about prior to your verdict? Do you remember any discussion about why is this case been around so long and why is this so old?

MR. BOYLES:  There was some discussion and then there was that one thing I noticed that he was already paying restitution.  He was on that one form already as a co-payee towards restitution, and I found that odd.

MR. HUEBER:  Was there any discussion about that?

MR. BOYLES:  I brought it to somebody's attention that he was already paying restitution and I was wondering why.  I questioned why he would already be doing that.

MR. HUEBER:  Was there any speculation as to why he would have already been paying restitution?

MR. BOYLES:  No. Somebody else said there might be more about this and we'll find out later or something.

MR. HUEBER:  Okay.

THE COURT:  I am curious.  What was it that showed he was paying restitution?

. . .

MR. BOYLES:  I don't know.  It was one of the forms that you had.

MR. ROLLINS [prosecutor]:  It was the restitution schedule.  It was Jake's or Eric's.  I think it was Jake Hatfield.

THE BAILIFF:  It was an exhibit.

. . .

THE COURT:  It went right by me.

MR. BOYLES:  I thought I just picked that up and I just, you know, I am not very smart when it comes to legal stuff.

THE COURT:  You are smarter than me, apparently.

. . .

MR. WETZEL:  Do you remember the discussion about why John was paying restitution or ordered to pay restitution?

MR. BOYLES:  It didn't go very far.  I just brought it up and it kind of, I think somebody said, well, there might be more about this that we would know about, might hear about it later and just kind of went by.  There was no real --

MR. WETZEL:  Okay.

MR. BOYLES:  Just one of those passing things.

MR. WETZEL:  Did you think that John had been convicted before of this thing?

MR. BOYLES:  No. I didn't know that. I didn't think that at all.  I just thought it was strange that it was four years.  We all thought that.

(Ct. Rec. 1, at 118-119.)

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 6

1    The Court of Appeals noted in its opinion denying collateral
2    relief:

3         Mr. Swiger next claims he was prejudiced by inadvertent
          delivery to the jury of defense Exhibit 28--the
4         restitution record containing inadmissible extraneous
          evidence showing him as a co-payor. . . .
5         . . .

6         . . . Appellate review of the underlying issue now raised
          in this collateral attack would have thus been foreclosed
7         by the invited error doctrine. . . . *See State v. Studd*,
          137 Wn.2d 533, 550-551 (1999).
8

9    (Ct. Rec. 7, Ex. 11 at 6.)

10        As noted by the state appellate court, the admission of this

11   Exhibit does not involve juror misconduct with respect to discussion

12   of the exhibit during deliberations because it was offered by the

13   defense and admitted by the court notwithstanding objection by the

14   prosecution. (Ct. Rec. 7, Ex. 11 at 9 n.1.)  Thus, the state court

15   properly declined to review the claim as being procedurally

16   defaulted. *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977).  A federal

17   court may not review a state conviction, even for federal

18   constitutional claims, if the state court judgment procedurally

19   barring the petitioner's claims rested on an "independent and

20   adequate" state law ground. *Coleman v. Thompson*, 501 U.S. 722, 729

21   (1991). Procedural default, a particular type of adequate and

22   independent state ground, "applies to bar federal habeas review when

23   the state court has declined to address the petitioner's federal

24   claims because he failed to meet state procedural requirements."

25   *McKenna v. McDaniel*, 65 F.3d 1483, 1488 (9th Cir. 1995), *cert.*

26   *denied*, 517 U.S. 1150 (1996). Procedural default is an affirmative

27   defense, and the state has the burden of showing the default

28

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 7

constitutes an adequate and independent ground. *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir.), *cert. denied*, 540 U.S. 938 (2003). Thus, the ultimate burden is on Respondent, not Petitioner, to show a procedural state bar was clear, consistently applied, and well-established at the time the party contesting its use failed to comply with the rule in question. *See id.* at 583.

Respondent asserts the state court correctly relied on the invited error doctrine to deny relief; therefore, this court is precluded from granting federal habeas relief on this claim. *Bennett*, 322 F.3d at 580. Invited error is a procedural rule well-established and consistently applied by the Washington state courts. *In Re Personal Restraint of Breedlove,* 138 Wn.2d 298, 312, 979 P.2d 417 (1999) (the doctrine of invited error "prohibits a party from setting up an error at trial and then complaining of it on appeal"). See also *State v. Wakefield*, 130 Wn.2d 464, 475, 925 P.2d 183 (1996); *State v. Aho*, 137 Wn.2d 736, 744-45, 975 P.2d 512 (1999); *City of Seattle v. Patu*, 147 Wn.2d 717, 720, 58 P.3d 273 (2002) (even if the error is constitutional, if it has been invited by the defendant, there will be no relief on appeal). Petitioner has not shown cause and prejudice and/or miscarriage of justice to overcome the state court's appropriate reliance on the invited error doctrine and procedural default. See *Boyd v. Thompson*, 147 F.3d 1124, 1126 (9th Cir. 1998) (*quoting Coleman*, 501 U.S. at 750. Accordingly, to the extent Petitioner in his first claim relies upon the inadmissibility of defense Exhibit 28 and the jury's discussion of the exhibit during deliberations, **IT IS RECOMMENDED** the claim be **DISMISSED WITH PREJUDICE** as procedurally defaulted.

**FEDERAL HABEAS: STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ["AEDPA"], Pub. L. No. 104-132 (codified in scattered sections of Titles 8, 15, 18, 22, 28, 40, 42, 50 U.S.C.), governs the disposition of federal habeas proceedings. Under the AEDPA, an application for a writ of habeas corpus "shall not be granted with respect to any claim that was 'adjudicated on the merits' unless the adjudication (1) resulted in a decision that was contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1) and (2).

**UNFAIR TRIAL**

Petitioner first contends the state courts committed error when they concluded, factually, there was no consideration by the jury during deliberations of the extra-judicial information and, legally, that it was Petitioner's burden to demonstrate prejudice. Alternatively, if the burden was on the state to show an absence of prejudice, Petitioner contends that burden was not met. Respondent argues the state court decision was not contrary to or an unreasonable application of clearly established Supreme Court law.

A.   <u>Legal Challenge</u>

Petitioner challenges the state court ruling on legal grounds, asserting the state courts violated his Sixth Amendment right to an unbiased jury trial by imposing on him the burden of showing prejudice resulting from the consideration of extra-judicial

information by the jury.  Petitioner relies on *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966),[2] which held the trial court has a duty to correct any prejudice resulting from the jury's exposure to extra-judicial information.  Citing *Marshall v. United States*, 360 U.S. 310, 313 (1959), *Sheppard* noted that a defendant must be convicted on information tested in open court, not on information received from outside sources.

An accused is entitled to the fundamental right of a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right.  *See, e.g., Sheppard*, 384 U.S., at 350-351; *Turner v. Louisiana*, 379 U.S. 466, 473 (1965) (evidence in criminal trial must come solely from witness stand in public courtroom with full evidentiary protections).  In 1892, the Supreme Court in *Mattox v. United States*, 146 U.S. 140, 148-150 (1892), established the bright-line rule that any unauthorized communication between a juror and a witness or interested party is presumptively prejudicial, but that the government may overcome the presumption with a strong contrary showing.  *See also Dickson v. Sullivan,* 849 F.2d 403 (9th Cir. 1988), *Jeffries v. Blodgett,* 5 F.3d 1180 (9th Cir. 1993); *Lawson v. Borg,* 60 F.3d 608 (9th Cir. 1995); *United States v. Armstrong*, 654

---

[2]In this case, the question before the court was whether Dr. Sam Sheppard was deprived of a fair trial for the second-degree murder of his wife because of the trial judge's failure to protect Sheppard from the massive, pervasive and prejudicial publicity during his prosecution. The facts here are distinguishable, involving a single newspaper article and witness statement.

F.2d 1328, 1331-33 (9th Cir. 1981), *cert. denied*, 454 U.S. 1157 and 455 U.S. 926 (1982) (upholding guilty verdicts but applying the *Mattox* presumption when a juror's husband had taken two obscene phone calls at home from an unidentified third party who said, "[t]ell your wife to stop hassling my brother-in-law at court"); *United States v. O'Brien*, 972 F.2d 12, 13-15 (1st Cir. 1992) (upholding a guilty verdict but applying the *Mattox* presumption where a police officer who was a potential prosecution witness, but who did not testify, spoke with three jurors during a recess about matters unrelated to the case); *United States v. Williams*, 822 F.2d 1174, 1188 (D.C. Cir. 1987) (upholding a guilty verdict but stating that the *Mattox* presumption is "operable even if the communication at issue consisted only of 'banter' not clearly directed at influencing the jury's verdict"); *United States v. Betner*, 489 F.2d 116, 117-19 (5th Cir. 1974) (ordering a new trial under *Mattox* because the prosecutor conversed with the jury panel during a recess and the trial court failed to conduct an adequate hearing).  The *Mattox* rule safeguards a defendant's Sixth Amendment right to a fair trial and to confront and cross-examine witnesses.  *Rinker v. County of Napa*, 724 F.2d 1352, 1354 (9th Cir. 1983) (applying the *Mattox* rule to a civil action and recognizing that the "harm inherent in deliberate contact or communication can take the form of subtly creating juror empathy with the party and reflecting poorly on the jury system").

In cases when improper contact with jurors has been *de minimis*, courts have departed from *Mattox* and placed the burden on the defendant to make an initial showing the contact influenced the

verdict before the burden shifts to the prosecution to show an absence of prejudice. *Caliendo v. Warden of California Men's Colony*, 365 F.3d 691, 696 (9th Cir.), *cert. denied*, 543 U.S. 927 (2004), citing *United States v. Day*, 830 F.2d 1099, 1103-04 (10th Cir. 1987) (stating that "[a] defendant must offer sufficient evidence to trigger the presumption of prejudice"). These cases demonstrate that if the contact does not raise even a risk of influencing the verdict, the *Mattox* presumption does not come into effect. See also *Lee v. Marshall*, 42 F.3d 1296 (9th Cir. 1994) (two police officers, one of them the investigating officer in the case, entered the jury room during deliberations without the court's permission to set up a VCR to replay a witness's testimony); *Helmick v. Cupp*, 437 F.2d 321 (9th Cir. 1971), *cert. denied*, 404 U.S. 835 (1971) (three arresting sheriff's deputies, one of them a prosecution witness, drove the jurors to the scene of the crime after being designated by the trial court as bailiffs for that purpose); and *Johnson v. Wainwright*, 778 F.2d 623 (11th Cir. 1985) (sheriff had a dual role as bailiff and assistant to the prosecution). Factors to be considered include the length and nature of the contact, the identity and role at trial of the parties involved, evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction. In weighing these factors the court must accord some deference to the findings of the trial judge who is in the best position to determine whether possibly prejudicial misconduct took place and, if

so, whether the government clearly established harmlessness.[3]

_____

[3]The trial court in making its findings following its examination of all the jurors, noted:

> In this case, there are, in effect, two Court instructions to the jury dealing with the prior conviction of Mr. Swiger. One of them is the curative instruction, that dealt with Mr. Hatfield blurting out that fact. And the second one was the general instruction to the jurors that they're not to read, view, or listen to any reports in the newspaper, or radio, or television about this trial.

> . . .

> To my recollection no one said that the newspaper article was discussed [during deliberations]. And my question to the jurors was, I believe, without fail to each one of them was, because the very first sentence of that article made reference to the prior conviction. Not one juror said that they had heard that during jury deliberations, coming from the newspaper article. There was one juror who, without naming the person, said that a juror indicated that his wife said that there was an article on this case, and the term "started to read from it" was used. He said, I don't want to hear about that. And she stopped.

> None of the other jurors seemed to indicate that they had any -— anything other than his statement that he told his wife not to read the article.

> I don't know if she's reading the headline, or read anything, or simply described that there was an article. At any rate, that juror was most adamant in that he heard nothing from his wife, from the article.

> That first line of the article is basically the same statement that was made by Jake Hatfield when he blurted it out. All the jurors did hear that. Or at least had the ability to hear it, whether it registered or not, most seemed to say they didn't even recall it. This Court did offer a curative instruction when the defense decided that they did not want to ask for a mistrial. That curative instruction instructed the jurors to totally disregard that statement and it should not be considered in any way in their deliberations, or held against the defendant.

> There is no indication, from any of the jury interviews that I had conducted that there was any

1  *Caliendo*, 365 F.3d at 697.

2      On direct appeal, the state court, in its analysis, addressed

3  the error involving the Hatfield statement and the newspaper

4  article, noting there was no evidence the jurors learned anything

5  from the article.  (Ct. Rec. 1, App. 1, Att. B at 5.)  As for the

6  Hatfield statement, the court relied on the curative instruction

7  that jurors not consider the statement, the presumption under state

8  law that jurors are presumed to follow the court's instructions, and

9  the trial court's finding the jurors did not consider the statement

10 during deliberations.  (Ct. Rec. 1, App. 1, Att. B at 5.)  In the

11 state court's Order dismissing the Personal Restraint Petition

12 (PRP), the Court of Appeals again considered constitutional

13 arguments arising from the Hatfield statement and the newspaper

14 article.  The state court noted Mr. Swiger "shows no actual or

15 substantial prejudice with regard to the issue" after relying on the

16 "court's juror interview transcripts that any juror was actually

17 exposed to the contents of newspaper article, much less that the

18 jury considered it in deliberations." (Ct. Rec. 7, Ex. 11 at 4.)

19 Additionally, the court noted there was no showing the jury

20 considered the Hatfield remark during deliberations.  The court

21 noted at most, there was a "technical" violation in light of juror

22 testimony the remark was mentioned after deliberations began.

23 Again, the Court of Appeals concluded Petitioner showed no actual or

24  _____

25         indication that they did, in fact, discuss it, or that it
        played any part in their jury deliberations.

26         Regarding the prior conviction, then, I find no
        evidence of juror misconduct.

27

28 (Ct. Rec. 7, Ex. 21, Report of Proceedings at 1086-88.)

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 14

1   substantial prejudice with regard to the issue. (Ct. Rec. 7, Ex. 11
2   at 5.)

3       Similar to the trial court ruling discussed in *Caliendo*, the
4   state courts here did not properly analyze the issue within the
5   *Mattox* structure that prejudice to the defendant is presumed and the
6   state has the burden of demonstrating the absence of prejudice.
7   *Caliendo*, at 697.  AEDPA's presumption of correctness does not apply
8   to state court findings based on erroneous legal standards.
9   *Fernandez v. Roe*, 286 F.3d 1073, 1077 (9th Cir.), *cert. denied*, 537
10  U.S. 1000 (2002).  Thus, this court will not accord deference to the
11  trial court's findings made in the absence of holding the government
12  to its heavy burden of proving the contact was clearly not
13  prejudicial.  *Caliendo*, at 698.  Rather, this court will review *de*
14  *novo* whether the contact was *de minimis* or sufficient to shift the
15  burden to the government to demonstrate there was no reasonable
16  possibility the communications influenced the verdict.

17  B.   Factual Challenge

18      Contrary to the state court's factual findings, Petitioner
19  contends the juror statements under oath from several jurors
20  indicated knowledge of Petitioner's first trial and two of those
21  jurors (Hancock and Krussow) averred this knowledge was considered
22  during deliberations.  This court has reviewed the transcripts of
23  jurors' examination by the trial court and finds the following
24  testimony to be relevant to the disposition of the claim:

25      1.   Examination of Juror Valsvig:

26      THE COURT:  . . .  Apparently there was an article
    that ran in THE SPOKESMAN-REVIEW the morning that you started
27  deliberating.  And the question to you was:  Do you recall
    anyone saying that their spouse had read that to them or
28

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 15

1  started to read that article to them?

2      . . .

3      MS. VALSVIG:  He said his wife said that -- he was in
there, was going to start reading to him and he said he
4  didn't want to hear it.

5      THE COURT:  Do you know, did he say anything about
did she start to read it?
6
7      MS. VALSVIG:  Well, was going to read it to him.  I
don't know if she had started it or -- said she started
reading, he said, I don't want to hear anything about it,
8  I'm not supposed to.  That's all he said, so I don't know
if she read something to him or what the deal is. . . .
9
. . .
10
11      THE COURT:   -- Jake Hatfield, do you remember his
testimony?

12      MS. VALSVIG:  Umm --

13      THE COURT:  I'll tell you what --

14      . . .

15      MS. VALSVIG:  Yeah, it does seem like I heard
something about it but I don't --
16
17      THE COURT:  Did anybody --

18      MS. VALSVIG: -- that he had served time or something
to that effect.

19      THE COURT:  Did anybody talk about that at all in
deliberations?
20
21      MS. VALSVIG:  No, I don't believe so.

22      THE COURT:  Did that make any difference to you?

23      MS. VALSVIG:  No. Matter of fact, I didn't even
remember it.

24  (Ct. Rec. 1, at 67-69.)

25      2.  Examination of Darryl Krussow

26      THE COURT:  The day you were deliberating there was
an article that ran in THE SPOKESMAN REVIEW. Do you recall
27  any jurors talking about that article or talking about
whether their spouse had started to read to them from that
28

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 16

1   article?

2       MR. KRUSSOW:  No. My wife said there was something in
    the paper but I told her I didn't want to listen and I
3   went in the other room.  And that was it.  I said I am not
    supposed to listen to anything like that, so I never read
4   the article.

5       THE COURT:  Did she read any part of it to you?

6       MR. KRUSSOW:  No. She just said there was something
    in the paper about it, and I said, I don't even want to
7   hear it.  I said, I am going in the other room so don't
    even try to discuss it with me. . . .

8       THE COURT:  Okay.  You must have shared that with
9   your fellow jurors?

10      MR. KRUSSOW:  No, I didn't.  We didn't talk about
    that until after we had made our decision and we were
11  clearing out of the courtroom.

12      THE COURT:  I see. Okay.

13      MR. KRUSSOW:  Someone told me about it afterwards,
    but not, not before we made our decision.  It had no
14  bearing on -- because I didn't even know about the case
    before, either.
15
    . . .
16
        THE COURT:  Okay. And Mr. Hatfield blurted that out.
17  Do you recall that being discussed by the jury at all?

18      MR. KRUSSOW:  No, we didn't discuss that.  All we did
    is just looked at the facts and determined our decision
19  from the facts.  I don't think any juror ever mentioned
    anything about it --
20
        THE COURT:  Okay.
21
        MR. KRUSSOW:  -- as far as I recall.
22
    . . .
23
        MR. WETZEL [counsel for defense]: . . .  You said
24  that after the trial when you were walking out some of the
    jurors talked about the newspaper article?
25
        MR. KRUSSOW:  They just said they saw an article in
26  the newspaper.  Then didn't explain to me what it was.

27  . . .

28

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 17

1        MR. KRUSSOW:   They just said that there was an
   article in the paper.   They didn't -- from what I
2  understand not one of them read the article prior to when
   we were in deliberation.

3

4  (Ct. Rec. 1, at 81-85.)

5        3.   <u>Examination of Juror Lewis</u>

6        THE COURT:  ... there was an article that was run in
   THE SPOKESMAN REVIEW newspaper about this case.   Do you
7  recall reading that newspaper article?

8        MS. LEWIS:  No, I didn't read it.

9        THE COURT:  Do you recall anyone in the jury room
   saying that someone started to read it to them?
10
         MS. LEWIS.  No.
11
         THE COURT:  No one discussed the newspaper article or
12  --

13       MS. LEWIS:  No, not that I remember.

14       THE COURT:  Okay.  And do you remember a witness by
   the name of Jake Hatfield?
15
         MS. LEWIS:  Yes.
16
         THE COURT:  And do you remember any of his testimony?
17  In particular, I am asking about whether you recall him
   blurting out that the defendant had been convicted before?
18
         MS. LEWIS:  Yes, I do remember that.
19
         THE COURT:  Okay.  Did that play any part in your
20  decision?

21       MS. LEWIS:  No.

22  . . .

23       MR. WETZEL:  . . . Did you -- Judge Austin asked you
   if Jake Hatfield's statement that Mr. Swiger had been
24  convicted before played any part in your decision and you
   said it hadn't.  Did you hear that discussed in the jury
25  room from anyone?

26       MS. LEWIS:  No, not until afterwards, after the --
   after we had made our decision in the -- you know, someone
27  brought it up.

28

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 18

(Ct. Rec. 1, at 77-80.)

    4.   <u>Examination of Juror Hancock</u>

    THE COURT:  . . . there was a newspaper article about this case.

    MS. HANCOCK:  Uh huh.

    THE COURT:  And there is some evidence before me that one or more of the jurors may have discussed that their spouse started to read the article to them or something like that.  Do you recall anything like that?

    MS. HANCOCK:  No, I don't.  I recall after, you know, we had started talking that there – somebody had said something like that, and I said well, that was pretty stupid because we were told not to.

. . .

    THE COURT:  But Mr. Jake Hatfield blurted that out.

    MS. HANCOCK:  You know, I missed that.

    THE COURT:  Did you.

    MS. HANCOCK:  I totally missed that.  When somebody said something, you know, after we started deliberating, I went, I don't remember that, myself.  I don't remember -- at times it seemed, the courtroom seemed awfully confused and chaotic.  It was sometimes hard to follow what was -- anybody was saying and what was going on.  So at that -- I didn't -- didn't catch it.

. . .

    MR. HUEBER:  . . . You mentioned concerning the article that someone said something after we started talking, is that -- when was that in point in time?

    MS. HANCOCK:  It was farther into it.  I mean we had already gone through and talked about, you know, if we voted right now where would you be, would it be guilty or not guilty or undecided and just in terms of the conversation around the table.

    THE COURT:  And that was before you reached the final verdict that you took this --

    MS. HANCOCK:  All of this was before the final verdict.

. . .

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 19

1      THE COURT:  Do you remember what was said about the
       article?
2
       MS. HANCOCK:  No, just somebody said, you know, my
3  wife started to read it to me and I told her to stop, I
   couldn't hear that.  And that's all that they said.
4
       THE COURT:  Okay.
5
       MS. HANCOCK:  They didn't make any mention of the
6  fact of what it said or what it said you know, the wife
   had started to read it and they went, oh god, I'm not
7  supposed to hear this.

8  . . .

9      MR. HUEBER:  But then you said during deliberations
   when it was brought up, you realized that.
10
       MS. HANCOCK:  Somebody made mention of the fact that
11 they thought that they had heard that he had been
   convicted before.
12
   . . .
13
       MS. HANCOCK:  You know . . . this seems awfully
14 strange that this case is being tried now in 2001 when
   this happened in 1995.  That was the only thought that I
15 had coming into the jury room, how come so much time had
   passed.
16
   . . .
17
       MR. ROLLINS [prosecutor]:  In terms of the -- what do
18 you remember about the prior statement of -- or some juror
   brought out something that Hatfield said that he was
19 convicted previously, do you recall?

20 . . .

21     MR. ROLLINS:  But in terms of it playing any factor
   --
22
       MS. HANCOCK:  No.
23
       MR. ROLLINS:  -- in your deliberations.
24
       MS. HANCOCK:  None whatsoever, no.
25
26 (Ct. Rec. 1, at 132-138.)

27

28

5. <u>Examination of Juror Schmaltz</u>

THE COURT:  There was an article in THE SPOKESMAN REVIEW. . . . Does that ring a bell with you?

MR. SCHMALTZ:  I think actually it does.

THE COURT:  Okay.  And can you tell me what best you remember about that?

MR. SCHMALTZ:  I think it was one of the females and I can't remember anybody's name right now, because it's been so long.  But she -- she had said that pretty much what you said that she or her husband had saw an article and I don't know if she said in the REVIEW or which one, but one of the newspapers.  And I think that she just told him she didn't want to know nothing about it.  And that's pretty much all I remember about that.

. . .

THE COURT:  And -- well, Jake Hatfield disregarded that and blurted out that Mr. Swiger had been converted - convicted once before.  Do you recall him saying that? Or any witness stating that?

MR. SCHMALTZ:  Actually, I think I do.

THE COURT:  Okay,  And was that discussed during deliberations.

MR. SCHMALTZ:  No, it was not.

(Ct. Rec. 1, at 145-147.)

6. <u>Examination of Juror Siwinski</u>

THE COURT:  It has come to our attention that one of the jurors, maybe more, had said that either their spouse or somebody else had started to read the article to them.

MR. SIWINSKI:  Uh huh.

THE COURT:  And they said no, I can't hear it.

MR. SIWINSKI:  Uh huh.

THE COURT:  Do you recall anything like that?

MR. SIWINSKI: Yes.

THE COURT:  Okay.  Did they tell you anything about what was in the article?

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 21

MR. SIWINSKI: Not at all.  That wasn't even discussed if I remember correctly.

THE COURT:  What is important about that is the very first sentence of that indicated that Mr. Swiger had been convicted of this crime before.

MR. SIWINSKI: Oh. Okay.

. . .

THE COURT:  Which I hadn't told you. . . But one of the witnesses, Jake Hatfield, blurted that out.  Do you recall that?

MR. SIWINSKI: No, I do not.

. . .

MR. WETZEL:  Mr. Siwinski, do you remember what the person said who talked about the newspaper article?

MR. SIWINSKI: Other than the fact that there was just an article in the paper that might have been about this trial and we weren't supposed to read the papers.  He says I don't want to hear any more.  And that's the extent of it.  That's —— that was his comments.  This was to just -- in general to the jurors.  And --

THE COURT:  He told whoever -- if I understand this, I don't want to hear about it?

MR. SIWINSKI: Yeah.  He told his wife, I don't want to hear about it, correct.

(Ct. Rec. 1, at 141-144.)

6.  <u>Examination of Juror Zastrow</u>

THE COURT:   . . . It has been reported that during deliberations perhaps one or more jurors said that their spouses started to read the article and they told them, "I can't hear that."  Do you recall anything like that?

MR. ZASTROW:  With me reading an article?

THE COURT:  Not necessarily you, but anyone else.

MR. ZASTROW: No.

THE COURT:  You don't recall anyone saying something like, "well, my wife or my husband started to read this article to me and I told them to stop"?

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 22

1          MR. ZASTROW: I don't, no.

2          . . .

3          THE COURT:   And then, second of all, there was a
   witness by the name of Jake Hatfield.   Do you remember
4   him?

5          MR. ZASTROW: Yes.

6          THE COURT:   He was told that he wasn't supposed to
   talk  about a prior conviction, but yet he blurted that
7   out.

8          MR. ZASTROW: I do recall that.

9          THE COURT:   You do recall.   Do you recall, was that
   discussed at all in the jury room?
10
           MR. ZASTROW: Yeah, but I don't know if that was after
11   we made the decision or during the discussions.

12          THE COURT:   Could it have been during?

13          MR. ZASTROW: It could have been, yeah.

14          THE COURT:   Did that play any part in your decision?

15          MR. ZASTROW: No, not in mine.

16          THE COURT:   Why is that?

17          MR. ZASTROW: I thought he was guilty from the witness
   that was there, and I don't remember the gentleman's name,
18   but that was real close in the parking lot there and with
   the other facts in the case.
19

20   (Ct. Rec. 1, at 154-155.)

21     "No bright line test exists to assist courts in determining

22   whether a petitioner has suffered prejudice from juror misconduct.

23   We therefore place great weight on the nature of the extraneous

24   information that has been introduced into deliberations." *Mancuso*

25   *v. Olivarez*, 292 F.3d 939, 950 (9th Cir. 2002).   As noted earlier,

26   the factors to be considered include the length and nature of the

27   contact, the identity and role at trial of the parties involved,

28

evidence of actual impact on the juror, and the possibility of eliminating prejudice through a limiting instruction. *Caliendo*, at 697-698. At most, there is equivocal evidence from Juror Zastrow that the prior conviction, either as referenced by Mr. Hatfield or the newspaper, "could" have been discussed during deliberations, but it played no part in his determination of guilt or innocence. His conclusion that the prior conviction was discussed during deliberations is inconsistent with the testimony of Juror Schmaltz and the other jurors cited above who indicated the fact of a prior conviction was not discussed during deliberations or a factor in the verdict. Moreover, as to Mr. Hatfield's statement, defense counsel discussed with his client moving for a mistrial but decided against it and opted for only a curative instruction. Thus, any prejudicial effect of the Hatfield statement was eliminated by the instruction. *See Thompson v. Borg*, 74 F.3d 1571, 1575-76 (9th Cir.), *cert. denied*, 519 U.S. 889 (1996).[4] Petitioner has demonstrated only that the

---

[4]*Thompson* presents an alternative structure for analyzing jury taint, using the *Brecht* [*Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (*quoting Arizona v. Fulminante*, 499 U.S. 279, 307-08 (1991)] structural v. trial error standard, placing the burden on the defendant to demonstrate prejudice or on the court if an "equipoise" circumstance is presented. *Thompson*, 74 F.3d at 1575. The facts here at most would demonstrate trial error. The dissenting opinion in *Thompson* criticizes the majority for disregarding the *Mattox* presumption. *Thompson,* 74 F.3d at 1577, Reinhardt, J. dissenting. This court applies the more stringent *Mattox* standard as refined by

1  unauthorized communication was *de minimis* and did not influence the

2  deliberative process.   Accordingly, **IT IS RECOMMENDED** the claim be

3  **DISMISSED WITH PREJUDICE.**

4  **INEFFECTIVE ASSISTANCE OF COUNSEL**

5      Petitioner contends his counsel during trial and on appeal was

6  ineffective because trial counsel neglected to redact that portion

7  of the defense exhibit that referred to Petitioner's restitution

8  arising from the first trial and conviction, and appellate counsel

9  did not raise the issue on direct appeal.   Petitioner contends the

10 exhibit had no basis in fact as his judgment and conviction had been

11 voided.   Moreover, Juror Boyles testified the restitution order was

12 discussed by them during deliberations. (See testimony of Juror

13 Boyles, *infra* at 5-6.) Petitioner argues the admission of the

14 exhibit did not constitute sound trial strategy and should have been

15 raised on direct appeal.   Respondent argues the claim should be

16 dismissed as the federal court owes a level of deference to the

17 state court's adjudication of the claim, relying on a strong

18 presumption of competence and a failure to demonstrate prejudice.

19      The state court addressed the ineffective assistance claim in

20 its Order dismissing the PRP:

21       First, it is clear that Mr. Swiger's trial counsel offered
         Exhibit No. 28 and the court admitted it over the State's
22       objection.   Appellate review of the underlying issue *now*
         raised in this collateral attack would have thus been
23       foreclosed by the invited error doctrine unless appellate
         counsel also made an ineffective assistance of trial
24       counsel claim with regard to offering the exhibit.  . . .
         Mr. Swiger's new counsel in this petition does not appear
25       to argue that appellate counsel should have also raised an

26  ――――――――――――――

27  the *de minimis* showing set forth in *Caliendo,* which benefits

28  Petitioner.

REPORT AND RECOMMENDATION TO DISMISS
WITH PREJUDICE CLAIMS FOR HABEAS RELIEF - 25

ineffective assistance of trial counsel claim.  And even
if appellate counsel had argued that trial counsel
performed ineffectively with regard to the exhibit, Mr.
Swiger would still have to show actual prejudice.

Trial counsel's offering Exhibit 28 was a legitimate
strategy insofar as it showed Mr. Hatfield's restitution
obligation.  The State's star witness Eric Hood had been
extensively cross-examined by defense counsel about his
plea to a lesser charge obligating him to court costs, but
no fine or restitution, in exchange for his testimony
against Mr. Swiger.  Defense counsel then offered Exhibit
28 to buttress Mr. Hatfield's credibility versus that of
Mr. Hood by showing Mr. Hatfield's substantial restitution
liability after he refused a plea deal with no restitution
if he would say that Mr. Swiger hit the victim in the head
with a bat.

Mr. Swiger now bootstraps this trial tactic into an
ineffective assistance of appellate counsel claim based on
statements made by a juror (Mr. Boyles) in the post-trial
interview.  Defense counsel asked Mr. Boyles if there had
been any discussion in the jury room about why the
incident happened in 1995 but the trial did not occur
until 2001. . . .  [See Mr. Boyles testimony infra.]

. . .

It is thus apparent from Mr. Boyles' statements that
the reference to Mr. Swiger on the restitution exhibit
played no part in his decision that Mr. Swiger was guilty.
And Mr. Swiger makes no showing that any other juror's
decision was influenced by the exhibit.

In this situation, the invited error doctrine would
have foreclosed any substantive challenge on appeal, and
an ineffective assistance of trial counsel claim would
have failed for lack of prejudice.  Mr. Swiger's claim
that appellate counsel gave him ineffective assistance
therefore also fails.

(Ct. Rec. 7, Ex. 11 at 6-9.)

To establish a claim of ineffective assistance of counsel,

Petitioner must prove (1) that his counsel's representation fell

below an objective standard of reasonableness and (2) that such poor

performance prejudiced the defense.  *Strickland v. Washington*, 466

U.S. 668 (1984).  When considering the first prong, the reviewing

court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.   Strategic decisions are "virtually unchallengeable." *Id.* at 690.  As to the second prong, prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Here, the basis for Petitioner's claim is the admission of defense Exhibit 28 with the inadvertent reference to Petitioner's restitution amount offered by the defense during trial.   The state courts concluded the decision to offer the un-redacted Exhibit involved reasonable trial tactics. (Ct. Rec. 7, Exhibit 19 at 770.) Trial tactics are not grounds for federal habeas relief.  *Beaty v. Stewart*, 303 F.3d 975, 984 (9th Cir. 2002), *cert. denied*, 538 U.S. 1053 (2003).  However, the more appropriate question is whether the failure to redact the Exhibit, intentionally or through inadvertent oversight by defense counsel, constituted ineffective assistance. Even assuming for the sake of argument, defense counsel at trial violated the standard of care by failing to make the redaction (that the error was so serious that trial counsel was not functioning as the "counsel" guaranteed under the Sixth Amendment, *Strickland*, 466 U.S. at 687), Petitioner has not provided clear and convincing evidence to rebut the state court's finding there was no prejudice. As noted in Juror Boyle's testimony, he did not consider the reference to restitution in arriving at his decision to convict. Moreover, there is no testimony from any other juror the restitution

reference was considered during the deliberative process.  Finally, appellate counsel's failure to raise the issue on direct appeal did not result in prejudice because the claim, as noted in the PRP, would have been denied under the invited error doctrine.  Thus, Petitioner has failed to demonstrate that but for the error, the result would have been different.  *Id.* at 694; *Mancebo v. Adams*, 435 F.3d 977, 979 (9th Cir. 2006), *petition for cert. filed* January 12, 2006, (discussing prejudice prong).  The state court's opinion was not an unreasonable application of the *Strickland* standard. Accordingly, **IT IS RECOMMENDED** the claims be **DISMISSED WITH PREJUDICE.**

**OBJECTIONS**

Any party may object to a magistrate judge's proposed findings, recommendations or report within ten (10) days following service with a copy thereof.  Such party shall file written objections with the Clerk of the Court and serve objections on all parties, specifically identifying any the portions to which objection is being made, and the basis therefor.  Any response to the objection shall be filed within ten (10) days after receipt of the objection. Attention is directed to Fed. R. Civ. P. 6(e), which adds another three (3) days from the date of mailing if service is by mail.

A district judge will make a de novo determination of those portions to which objection is made and may accept, reject, or modify the magistrate judge's determination.  The judge need not conduct a new hearing or hear arguments and may consider the magistrate judge's record and make an independent determination thereon.  The judge may, but is not required to, accept or consider

additional evidence, or may recommit the matter to the magistrate judge with instructions. *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000); 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Civ. P. 73; LMR 4, Local Rules for the Eastern District of Washington.

A magistrate judge's recommendation cannot be appealed to a court of appeals; only the district judge's order or judgment can be appealed.

The District Court Executive is directed to file this Report and Recommendation and provide copies to counsel for Petitioner and Respondent and the referring district judge.

DATED May 22, 2006.


          S/ CYNTHIA IMBROGNO
       UNITED STATES MAGISTRATE JUDGE